IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| TRANS UNION, LLC, )<br>        *Movant*, )<br>        v. )<br>KERRY SCROGGINS, )<br>        *Respondent*. ) | Case No. 3:24-mc-2-MHL-SLS |

**MEMORANDUM OPINION**

This matter comes before the Court on Movant Trans Union, LLC's ("Trans Union") Motion to Quash Subpoena (the "Motion") (ECF No. 2), which has been referred to the undersigned Magistrate Judge for resolution under 28 U.S.C. § 636(b)(1)(A) (ECF No. 20). Respondent Kerry Scroggins ("Scroggins") opposed the Motion (ECF No. 27), and Trans Union filed a reply in support of the Motion (ECF No. 35), making it ripe for disposition. The Court dispenses with oral argument because the materials before the Court adequately present the facts and legal contentions and argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J). Having considered the briefing and record before the Court, and for the reasons set forth below, the Court will GRANT IN PART Trans Union's Motion to the extent it seeks to quash the Subpoena and will DENY IN PART Trans Union's Motion to the extent it seeks an award of attorneys' fees and expenses under Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure.

    **I.**    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    **A.**  **Scroggins filed a lawsuit in this Court against LexisNexis Risk Solutions FL Inc.**

On August 11, 2022, Scroggins filed a lawsuit in this Court against LexisNexis Risk Solutions FL Inc. ("LNRSFL"), alleging violations of the Fair Credit Reporting Act (the "FCRA"),

15 U.S.C. § 1681 *et seq.*, and relating to LNRSFL's inaccurate reporting of Scroggins as deceased. Complaint and Demand for Jury Trial, *Scroggins v. LexisNexis Risk Solutions FL Inc.*, No. 3:22-cv-545-MHL (E.D. Va. filed Aug. 11, 2022) (hereinafter "Compl."). The Court refers to this civil action as the *Scroggins* litigation.

The initial Complaint asserted a violation of 15 U.S.C. § 1681e(b) based on LNRSFL's alleged failure "to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports they furnished regarding" Scroggins, which resulted in it publishing her consumer report to creditors indicating she was deceased. (Compl. ¶ 63.) It also alleged a violation of 15 U.S.C. § 1681i based on LNRSFL's alleged failure "to delete inaccurate information in [Scroggins'] consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation and by failing to maintain reasonable procedures with which to filter and delete the inaccurate deceased reporting in [Scroggins'] credit file." (Compl. ¶ 69.)

Thereafter, Scroggins amended her Complaint to assert class claims. The Second Amended Class Action Complaint, the current operative complaint, brings claims on behalf of a putative class of consumer plaintiffs alleging that LNRSFL violated 15 U.S.C. §§ 1681e(b) and 1681g(a) by falsely reporting consumers as deceased in its consumer reports and failing to disclose to consumers who requested FCRA-mandated file disclosures all information regarding its deceased reporting. Second Amended Class Action Complaint ¶¶ 3-5, 131-76, *Scroggins v. LexisNexis Risk Solutions FL Inc.*, No. 3:22-cv-545-MHL (E.D. Va. filed Nov. 10, 2023) (hereinafter "2d Am. Compl."). (*See also* ECF No. 2-4.) Scroggins also brings an individual claim against LNRSFL under 15 U.S.C. § 1681i for failure to reinvestigate and delete inaccurate deceased reporting. (2d Am. Compl. ¶¶ 6, 177-85.)

As pertinent here, the Second Amended Class Action Complaint alleges that LNRSFL "collects consumer data through a shared process with LexisNexis Risk Solutions, Inc. ('LNRS') and other related entities, some of which acknowledge FCRA-governance" and then "sells the data for FCRA governed purposes." (2d Am. Compl. ¶ 2.) Scroggins further asserts that LNRSFL "purchases consumer credit reporting data from conventional [credit reporting agencies ('CRAs')] like Equifax, TransUnion and Experian and integrates these into its own products." (2d Am. Compl. ¶ 2; *see also* 2d Am. Compl. ¶ 32.) Scroggins alleges that "LNRS agreed to purchase consumer reports from Experian and TransUnion which contained deceased indicators pertaining to specific consumers. LNRS obtained authority from these admitted CRAs to share these consumer reports with its affiliates," including LNRSFL. (2d Am. Compl. ¶ 33.) Scroggins contends that LNRS and the CRAs "referred to the consumer reports purchased by LNRS as 'credit header data'" to "perpetuate the fiction that deceased indicators fall outside the coverage of the FCRA." (2d Am. Compl. ¶ 34.) She alleges that a deceased indicator obtained from a CRA "cannot be characterized as 'credit header data' outside the ambit of the FCRA." (2d Am. Compl. ¶ 34; *see also* 2d Am. Compl. ¶ 44 ("Nothing in the FCRA allowed [LNRSFL] to transmute deceased indicators tied to specific consumers, i.e., consumer reports, 'collected' in whole or in part for consumer reporting purposes by Experian and TransUnion, into 'credit header data' outside the ambit of the FCRA.").)

B. **Scroggins serves the subpoena at issue on non-party Trans Union.**

The *Scroggins* litigation does not name Trans Union as a party. But as discussed above, the Second Amended Class Action Complaint identifies Trans Union as one of the CRAs who allegedly sold information to LNRS or an affiliate.

On May 19, 2023, Scroggins served a subpoena on Trans Union, seeking the production of six categories of documents for the *Scroggins* litigation. (ECF No. 2-1.) On June 23, 2023, Trans Union produced 350 pages of responsive documents to Scroggins along with its objections. (ECF No. 2-2.)

On June 26, 2023, Scroggins served a second subpoena on Trans Union, which is the subpoena at issue in this Motion (hereinafter the "Subpoena"). (ECF No. 2-3.) The Subpoena seeks the production of the following 16 categories of documents, six of which overlap with those sought in the May 19, 2023 subpoena:

1. A copy of any contract(s) you have with LexisNexis[1] pertaining to the sale or publication of all credit header data involving consumers.
2. A copy of any contract(s) you have with LexisNexis pertaining to the sale or publication of data containing deceased indicators or data otherwise identifying consumers as deceased.
3. Communications between TransUnion and LexisNexis related to contracts involving the provision of data containing deceased indicators or otherwise identifying consumers as deceased.
4. Communications between TransUnion and LexisNexis related to contracts involving the provision of credit header data.
5. All data TransUnion provided to LexisNexis pertaining to [Scroggins] or any of her personal identifiers from January 1, 2021 to the present, including but not limited to the date(s) of the provision of any such data and the source(s) of such data.
6. All data TransUnion provided to LexisNexis pertaining to Henry E. Scroggins . . . or any of his personal identifiers, including but not limited to the date(s) of the provision of any such data and the source(s) of such data.
7. All documents and electronically-stored information providing an archived record of the credit file(s) of [Scroggins] provided to LexisNexis from January 1, 2021 to the present.
8. All documents and electronically-stored information providing an archived record of any information pertaining to [Scroggins] provided to LexisNexis from January 1, 2021 to the present.
9. All data TransUnion provided to LexisNexis pertaining to any consumer which contained a deceased notation or deceased indicator from August 11, 2017, to the present.

---

[1] The Subpoena defines "LexisNexis" to include LNRSFL "and any of its parent companies, sister companies, subsidiaries, predecessors, or affiliates." (ECF No. 2-3, at 5.)

4

10. Documents sufficient to establish TransUnion's ability to produce records of past data provided to LexisNexis that contained deceased indicators or otherwise identified consumers as deceased, including the location of such records, the process for producing those records, and the retention period for such records.
11. Copies of any and all correspondence between TransUnion and LexisNexis regarding "linking" issues as they relate to [Scroggins] or any consumer with [Scroggins'] Social Security number as identified above.
12. Documents reflecting, as to TransUnion, the purpose, use, accuracy, and content of the Death Master File and/or Limited Access Death Master File.
13. Communications with any LexisNexis entity (including but not limited to LexisNexis Risk Solutions, Inc. and LexisNexis Risk Solutions FL, Inc.) regarding contract(s) under which you furnished credit header data, deceased indicator data, or any other product(s).
14. All contracts under which you sold any data to a LexisNexis entity.
15. Documents reflecting the creation, origin, source, purpose and accuracy of the deceased indicators or information identifying consumers as deceased you furnished to any LexisNexis entity.
16. Any documents regarding why or how deceased indicators or any information identifying consumers as deceased were included in the category of "credit header" data in the contracts under which they were sold to a LexisNexis entity.

(ECF No. 2-3, at 7-8.)

On January 19, 2024, Trans Union filed its Motion to Quash Subpoena in the Northern District of Illinois, requesting that the court quash the Subpoena under Rule 45(d)(3) of the Federal Rules of Civil Procedure and award it reasonable attorneys' fees and expenses for bringing the Motion pursuant to Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure. (ECF No. 2, at 1, 2, 7.) On February 7, 2024, Scroggins filed a Motion to Transfer the Motion to Quash Subpoena ("Motion to Transfer"), requesting that the court "transfer [the Motion to] the United States District Court for the Eastern District of Virginia, Richmond Division." (ECF No. 10, at l.) The Northern District of Illinois granted the Motion to Transfer and transferred the Motion to this Court on March 7, 2024. (ECF Nos. 17, 18, 19.)

In its Motion, Trans Union asserts that the Subpoena should be quashed in its entirety because: (1) it seeks information wholly irrelevant to Scroggins' claims; (2) the information sought

5

can be acquired through more convenient, alternative means; (3) it seeks confidential and privileged information; and (4) it is burdensome and overbroad. (ECF No. 2, at 1.) In her response, Scroggins argues, among other things, that the Subpoena seeks information relevant to show that LNRSFL qualifies as a CRA, that Trans Union's boilerplate objections based on burden and overbreadth should be rejected, and that Trans Union is the most convenient target of the subpoena. (ECF No. 27, at 2, 5, 9.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 45 directs a party issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d). Courts must enforce this duty and quash or modify a subpoena that, among other things, requires the disclosure of privileged material or is unduly burdensome. Fed. R. Civ. P. 45(d)(3)(A). In addition, courts may quash or modify a subpoena if it requires the disclosure of confidential information. Fed. R. Civ. P. 45(d)(3)(B). The moving party bears the burden of showing that a subpoena should be quashed under Rule 45. *Va. Dep't of Corr. v. Jordan*, No. 3:17-mc-2, 2017 WL 5075252, at *4 (E.D. Va. Nov. 3, 2017), *aff'd*, 921 F.3d 180 (4th Cir. 2019).

Rule 26 of the Federal Rules of Civil Procedure also governs the use of subpoenas. *Found. to Support Animal Prot. v. Vital Farms, Inc.*, No. 2:22-mc-23, 2023 WL 3446200, at *5 (E.D. Va. Apr. 3, 2023). Under this rule, material sought in discovery must be both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, No. 3:16-mc-1, 2016 WL 1071016, at *5 (E.D. Va. Mar. 17, 2016) ("A party may seek to quash or modify a subpoena on grounds of irrelevance or overbreadth, even though irrelevance and overbreadth are not explicitly listed as grounds to quash in Rule 26(c)(1) or Rule 45(c)(1), because either irrelevance or

6

overbreadth necessarily establishes undue burden."). When assessing this proportionality requirement, courts consider, among other things, whether the burden or expense outweighs the benefit of the discovery. Fed. R. Civ. P. 26(b)(1); *Peninsula Pathology Assocs. v. Am. Int'l Indus.*, No. 4:22-mc-1, 2022 WL 19574484, at *2 (E.D. Va. Dec. 23, 2022).

When discovery is sought from a nonparty, like Trans Union, a more demanding analysis applies because "[n]onparties faced with civil discovery requests deserve special solicitude." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 194 (4th Cir. 2019). Third parties "should not be drawn into the parties' dispute without some good reason, even if they have information that falls within the scope of party discovery." *Id.* at 189. While courts still consider whether the benefit of discovery outweighs the burden, "courts must give the recipient's nonparty status 'special weight.'" *Id.* Ultimately, "the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena." *Id.*; *see also Peninsula Pathology Assocs.*, 2022 WL 19574484, at *2.

Thus, "[w]hen assessing the benefit to the requesting party, courts should consider, among other things: the relevance of the information sought [and] the requesting party's need for it," including whether the requested information is available from other, more logical sources. *Peninsula Pathology Assocs.*, 2022 WL 19574484, at *2. "[W]hen assessing the burden to the recipient [of the subpoena], courts should consider, among other things, the financial cost of producing the information as well as 'other cognizable burdens,' such as (1) the impact of production on privacy or confidentiality interests; (2) the interests—including business interests—of the recipient and others who might be affected; and (3) whether the subpoena is overbroad and

7

would require 'tailoring' by the nonparty." *Id.* at *2 (quoting *Jordan*, 921 F.3d at 189-90). "Although a nonparty on a motion to quash, 'bears the burden of proof and of persuasion,' 'they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources.'" *People for the Ethical Treatment of Animals, Inc. v. Vital Farms, Inc.*, No. 2:22-mc-24-EWH-RJK, 2023 WL 2933303, at *4 (E.D. Va. Apr. 13, 2023) (quoting *Jordan*, 921 F.3d at 189 n.2). Courts are afforded broad discretion in resolving these issues. *Found. to Support Animal Prot.*, 2023 WL 3446200, at *5.

### III.  ANALYSIS

Weighing these factors and conducting this analysis, the Court finds that the Subpoena seeks some information relevant to the *Scroggins* litigation but also seeks a large amount of information irrelevant and not proportional to the needs of the case. To the extent relevant, the information could be requested either from LNRSFL or a related entity—more logical targets for the subpoenaed information. In addition, the burden that would be imposed by requiring non-party Trans Union to respond to the Subpoena significantly outweighs any benefit to Scroggins. For these reasons, and as further discussed below, the Court will quash the Subpoena.

**A.  The Subpoena seeks information that has minimal relevance and is not proportional to the needs of the case.**

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, materials sought in discovery must be "relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). Trans Union argues that the Subpoena seeks information "wholly irrelevant to [Scroggins'] very limited claims." (ECF No. 2, at 1.) It states that the "only plausible purpose of the Subpoena is to determine whether Trans Union provided information relating to [Scroggins] and the alleged deceased indicator to LexisNexis in 2021." (ECF No. 2, at 4.) It contends that it "already produced 350 pages of its consumer operations documents relating to"

8

Scroggins and that the requests for other consumer data and Trans Union information is "completely irrelevant" to claims or defenses in the *Scroggins* litigation. (ECF No. 2, at 5, 6.)

Scroggins counters that the Subpoena "seeks specifics of the data Trans Union transmitted to LexisNexis, including its origin." (ECF No. 27, at 1.) She contends that such information is relevant to show that LNRSFL qualifies as a consumer reporting agency because it "collects data—at least some of which [Scroggins] believes originates from Trans Union—and compiles it as part of selling consumer reports . . . ." (ECF No. 27, at 2.)

While a few categories in the Subpoena seek information relevant to the *Scroggins* litigation, the majority would no doubt sweep in irrelevant information given the scope and breadth of the requests. Categories 5, 7, and 8 ask for all data regarding Scroggins or her personal identifiers and all archived credit files or other information related to Scroggins and provided by Trans Union to any LexisNexis entity from January 1, 2021 to the present. Category 11 seeks copies of all correspondence between Trans Union and any LexisNexis entity regarding "linking" issues as they relate to Scroggins or any consumer with Scroggins' social security number. While these requests seek some information relevant to the *Scroggins* litigation, Trans Union states it has already produced 350 pages of its consumer operations documents relating to Scroggins in response. Trans Union moves to quash the Subpoena to the extent these requests would require a further response.

Category 6 asks for all data Trans Union provided to any LexisNexis entity at any time regarding Henry E. Scroggins, who is neither a named plaintiff in the *Scroggins* litigation nor otherwise identified in the operative complaint or the Motion briefing. As such, the current record

9

does not sufficiently establish any relevancy or need for Henry E. Scroggins' personal consumer information.[2]

The remaining categories seek broad swaths of information, sweeping in terms of time frames, entities, and products or data at issue and carrying minimal, if any, relevance to the *Scroggins* litigation. Categories 1 and 2 seek *any* contracts between Trans Union and *any* LexisNexis entity regarding the sale or publication of consumer credit header data or deceased indicators. Categories 3 and 4 seek communications between Trans Union and any LexisNexis entity related to those contracts. Category 9 seeks *all* data Trans Union provided to LexisNexis entities pertaining to *any* consumer which contained a deceased indicator from August 11, 2017 to the present. Categories 13 and 14 go even further and seek *all* contracts under which Trans Union sold *any data* to any LexisNexis entity as well as communications with any LexisNexis entity regarding contracts under which Trans Union furnished credit header data, deceased indicators, *or other products*. One request seeks data covering a seven-year period, and the others have no time limitation. These categories cover contracts and related communications with *all* LexisNexis entities, regardless of whether an entity touched Scroggins' or another putative class members' information. And some seek information regarding the furnishing of *any* data or product from Trans Union to a LexisNexis entity, not limited to deceased indicators and regardless of the accuracy of any deceased indicators. To the extent these categories seek some potentially relevant information, they also cover vast amounts of irrelevant information.

Moreover, all of the categories discussed above, including those limited to Scroggins, request information from Trans Union that could be provided by a LexisNexis entity instead. They

---

[2] To the extent Scroggins contends that a date of death for Henry E. Scroggins had been wrongly linked to her, Scroggins can seek such information from a LexisNexis entity, a more obvious alternative source of discovery.

10

seek information Trans Union provided to a LexisNexis entity or contracts and communications between Trans Union and any LexisNexis entity. The four remaining categories, however, appear limited to information in Trans Union's possession. Those four topics carry minimal, if any, relevance to the *Scroggins* litigation.

Category 10 asks for documents sufficient to show Trans Union's ability to produce records of data provided to a LexisNexis entity in the past that contained deceased indicators for consumers. This request seeks information regarding Trans Union's data retention policies and has no relevance to the claims or defenses in the *Scroggins* litigation.

Category 12 asks for documents reflecting, as to TransUnion, the purpose, use, accuracy, and content of the Death Master File and/or Limited Access Death Master File. How Trans Union views or uses the Death Master File or other data sources carries no significant probative weight to the claims or defenses in the *Scroggins* litigation.

Category 15 seeks documents reflecting the creation, origin, source, purpose, and accuracy of the deceased indicators or information identifying consumers as deceased that Trans Union furnished to any LexisNexis entity, and category 16 asks for documents regarding why or how deceased indicators or any information identifying consumers as deceased were included in the category of "credit header" data in the contracts under which they were sold to a LexisNexis entity. These requests appear to touch in part on Scroggins' allegations that LexisNexis entities "purchase[] by individual contracts consumer data from credit report agencies TransUnion and Experian, which these companies have themselves collected from creditors reporting tradelines" and refers to such data as "'credit header data'" to "perpetuate the fiction that deceased indicators fall outside the coverage of the FCRA . . . ." (2d Am. Compl. ¶¶ 32, 34.) These requests, however, seek originating data or information for *all* deceased indicators, regardless of accuracy, furnished

11

to *any* LexisNexis entity over an unlimited period. Given their breadth and scope, the requests seek information with minimal relevance to the *Scroggins* litigation.

Overall, the information sought in the Subpoena has minimal relevance to the *Scroggins* litigation and is not proportional to the needs of the case considering the scope and breadth of the topics.[3]

### B. **Scroggins may seek this information, to the extent relevant to the *Scroggins* litigation, directly from LNRSFL or its related entities.**

Trans Union next argues that most information sought in the Subpoena, specifically 12 of the 16 categories of information, may be obtained from LNRSFL, the defendant in the litigation, or a related non-party entity. (ECF No. 2, at 4-6.) Because Scroggins seeks information against Trans Union, a nonparty, she "should be able to explain why [she] cannot obtain the same information, or comparable information that would also satisfy [her] needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be *more logical targets* for the subpoena." *Jordan*, 921 F.3d at 189 (emphasis added). Scroggins has not provided an adequate explanation as to why she needs the requested information from Trans Union rather than LNRSFL or a LexisNexis affiliate.

Scroggins argues that LNRSFL "is one of a number of companies formed under the LexisNexis corporate umbrella" and did not have a contract or communications directly with Trans Union. (ECF No. 27, at 8, 9.) It remains unclear, however, whether LNRSFL may have "'the

---

[3] Trans Union also notes concerns that "this Subpoena is a 'fishing expedition' for information to use in other matters" because Scroggins' "counsel is a frequent filer of cases involving Trans Union and the FCRA." (ECF No. 2, at 3 n.1.) While Scroggins labels this concern as "hyperbolic" (ECF No. 27, at 6), she has now filed suit against Trans Union, bringing similar claims as those asserted in the *Scroggins* litigation against Trans Union. Class Action Complaint and Demand for Jury Trial, *Scroggins v. Trans Union, LLC*, No. 3:24-cv-367 (E.D. Va. filed May 21, 2024).

right, authority or practical ability to obtain the documents from [a LexisNexis related entity,] a nonparty to the action.'" *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 286 F.R.D. 288, 292 (E.D. Va. 2012) (quoting *Bush v. Ruth's Chris Steak House, Inc.*, 286 F.R.D. 1, 5-6 (D.D.C. 2012)). And "[t]here is no reason to burden a third party with discovery when the opposing party has all of the information requested." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *8.

Even assuming that LNRSFL has no right, authority, or practical ability to obtain the requested information from its related entities, Scroggins next contends that Trans Union serves as the "most efficient" means of obtaining the requested information "[i]nstead of sending scattershot subpoenas to each of the different LexisNexis affiliate and subsidiary companies (all of whom are also nonparties to *Scroggins v. LexisNexis*) . . . ." (ECF No. 27, at 9.) She fails to explain why she has not been able to identify the specific LexisNexis entity or entities at issue through discovery with LNRSFL such that she can send targeted subpoenas, rather than scattershot subpoenas. In any event, the LexisNexis entities qualify as more logical targets of subpoenas over unrelated, non-party Trans Union, meaning that Scroggins does not *need* to obtain the subpoenaed information from Trans Union. *Found. to Support Animal Prot.*, 2023 WL 3446200, at *5 ("Part of assessing need is assessing whether a requesting party can obtain the same or comparable information from one of the parties or a more logical third-party source . . . ."). Instead of burdening non-party Trans Union with the Subpoena, Scroggins should seek this information from LNRSFL or the "obvious third-party alternatives"—the related entities under the LexisNexis corporate umbrella.[4] *Jordan*, 921 F.3d at 191.

---

[4] Scroggins also contends that a few Subpoena categories seek information "answerable only by Trans Union," including how Trans Union views the Death Master File and accuracy of deceased indicators, why Trans Union reported deceased indicators as credit header data, and the

13

**C. Given the minimal relevance of the information sought, the overbreadth of the requests, and the limited need to obtain such information from Trans Union, the burden substantially outweighs any benefit of the Subpoena.**

Having determined that the Subpoena seeks minimally relevant information which largely could be obtained from a more logical source, the Court now turns to the burden side of the analysis. "[W]hen assessing the burden to the recipient [of the subpoena], courts should consider, among other things, the financial cost of producing the information as well as 'other cognizable burdens,' such as (1) the impact of production on privacy or confidentiality interests; (2) the interests—including business interests—of the recipient and others who might be affected; and (3) whether the subpoena is overbroad and would require 'tailoring' by the nonparty." *Peninsula Pathology Assocs.*, 2022 WL 19574484, at *2 (quoting *Jordan*, 921 F.3d at 189-90). Considering these factors, the burden of responding to the Subpoena substantially outweighs any benefit to Scroggins.

First, the requested production impacts privacy and confidentiality interests. Category 9 seeks *all* data Trans Union provided to *any* LexisNexis entity pertaining to *any* consumer which contained a deceased indicator, regardless of accuracy, over a seven-year period. Several other categories seek any communications between Trans Union and any LexisNexis entity related to contracts under which Trans Union sold consumer credit header data, deceased indicators, or other products, including communications containing confidential consumer information. Compliance with the Subpoena would impose a significant burden because it requires Trans Union "to reveal sensitive and confidential personal identifying information of non-party consumers, including

---

originating source for any deceased indicators provided to a LexisNexis entity. (ECF No. 27, at 9.) As discussed above, those categories of information seek information that has minimal, if any, relevance to her lawsuit against LNRSFL, and the scope of those requests are not proportional to the needs of the case.

14

names, social security numbers, dates of birth, telephone numbers, and addresses." (ECF No. 2, at 3.)

Second, compliance with the Subpoena negatively impacts the business interests of Trans Union. Trans Union contends that responding to the Subpoena would require it "to research and identify a multitude of materials," perform a "massive system search and data analysis," and then review responsive materials for applicable attorney-client, joint defense, or work product privileges. (ECF No. 2, at 3, 5.) Even though Scroggins has agreed to compensate Trans Union for reasonable costs incurred in searching for and producing requested information,[5] responding to the Subpoena would still require Trans Union to divert resources and attention from its normal operations to the Subpoena, which as served is overbroad on its face. *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *8 (considering diversion of resources and time sent to respond to an unnecessary subpoena in assessing the burden even though requesting party had agreed to compensate the subpoenaed party for expenses incurred). This further supports the burden imposed by the Subpoena.[6]

---

[5] Although Trans Union states that Scroggins "has not offered to reimburse Trans Union's costs" (ECF No. 35, at 2), it appears that Scroggins has "agree[d] to cover reasonable expenses incurred in searching for and producing" information responsive to certain categories in the Subpoena (ECF No. 27-2, at 4-8).

[6] Scroggins contends that Trans Union has not submitted any evidence to establish the burden it would incur in responding to the Subpoena and urges the Court to find Trans Union's objections unavailing for that reason. (ECF No. 27, at 5, 9-11.) "Although a nonparty on a motion to quash, 'bears the burden of proof and of persuasion,' 'they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources.'" *People for the Ethical Treatment of Animals, Inc.*, 2023 WL 2933303, at *4 (quoting *Jordan*, 921 F.3d at 189 n.2). As discussed earlier, the Subpoena requests information that has minimal relevance to the *Scroggins* litigation, and Scroggins has neither persuasively articulated her need for the information nor addressed obvious alternative sources for the minimally relevant information. Given the expansive scope and overbreadth of the Subpoena categories, it imposes an undue burden on Trans Union on its face.

15

Third, the Subpoena is overbroad and would require Trans Union to tailor it.[7] As previously discussed, the Subpoena seeks contracts and communications between Trans Union and any LexisNexis entity without regard to relevance to the *Scroggins* litigation. Numerous categories seek any and/or all information without restriction in time. Some categories cover products or data other than deceased indicators and regardless of the accuracy of the deceased indicators. And many categories pertain to LexisNexis entities regardless of whether or not those entities shared information with LNRSFL—the defendant in the *Scroggins* litigation. These flaws in the Subpoena render it overbroad and unduly burdensome. *See, e.g.*, *Found. to Support Animal Prot.*, 2023 WL 3446200, at *8 (finding requests for "any documents or communications" mentioning topic "in any context, at any time, for any reason" to be "overbroad and creating an undue burden" on non-party to litigation); *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *5 (finding that a subpoena which would require

---

[7] Trans Union states that the parties attempted to resolve this dispute without Court intervention, but that Scroggins' proposed compromises would still require it to "search and prepare infinite documents that can be easily obtained from LexisNexis." (ECF No. 2, at 2; ECF No. 35, at 2.) Trans Union filed the Motion because Scroggins did not withdraw the Subpoena or issue a narrowed, amended subpoena. (ECF No. 2, at 2; ECF No. 35, at 2.)

Scroggins, on the other hand, makes much of her offers to compromise and narrow the scope of the Subpoena. (ECF No. 27, at 3.) She paints Trans Union as unreasonable in declining her compromise offers and filing this Motion instead. (ECF No. 27, at 3.)

While Scroggins complains that she "has worked tirelessly to limit the scope of the subpoena to only that information that is directly connected to the core issues in *Scroggins v. LexisNexis*," her focus on post-service efforts is misplaced. (ECF No. 27, at 6.) Scroggins had an obligation to narrowly tailor the Subpoena *before* serving it. *Jordan*, 921 F.3d at 190 ("A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; the requesting party should have done that before serving it."); *see also In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *6 ("[S]ubpoenas must impose parameters explicitly limiting the scope of the subpoena to material relevant to the underlying case.").

the production of irrelevant or overbroad information "creates an undue burden because it necessarily imposes greater hardship than is necessary to obtain proper discovery").[8]

### D. **The Subpoena should be quashed rather than modified.**

Rule 45 of the Federal Rules of Civil Procedure grants the Court with discretion to either quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv). While "[m]ere overbreadth . . . usually warrants modifying a subpoena to narrow its scope, not quashing it," a "subpoena may be so sweepingly overbroad . . . that it should be quashed in its entirety." *Jordan*, 921 F.3d at 190 n.4.  Here, considering the minimal relevance of the requested information, its availability from a more logical target to the litigation, the substantial overbreadth and undue burden, and Trans Union's partial response, the Court, in its discretion, quashes the Subpoena.

While the Subpoena seeks some information relevant to the *Scroggins* litigation, it also requests a vast amount of information irrelevant to any party's claims or defenses.  A majority of the Subpoena seeks information without limitation as to time or scope to material relevant to the underlying litigation.  Moreover, to the extent it seeks minimally relevant information, such information could be obtained from either LNRSFL or its related entities—more logical targets than non-party Trans Union.  The significant burden which would be imposed on non-party consumers' privacy or confidentiality interests and non-party Trans Union's business interests in

---

[8] While Scroggins again labels Trans Union's objections as "boilerplate and meaningless without evidentiary support" (ECF No. 27, at 5), "[t]he overbreadth of these requests, especially given the minimal relevance of the information sought, is apparent on the face of the subpoena." *Peninsula Pathology Assocs.*, 2022 WL 19574484, at *3.

17

complying with the Subpoena significantly outweighs the potential benefit to Scroggins when considering the minimal relevance and need for the requested information.

Trans Union has already produced 350 pages of information related to Scroggins. (ECF No. 2, at 5.) It contends it needs additional information from either Scroggins or the LexisNexis entities to locate any additional information pertaining to Scroggins. (ECF No. 35, at 5.) As discussed above, Scroggins can request such information from LNRSFL or its affiliates rather than Trans Union. Considering Trans Union's partial response, the substantial overbreadth of the subpoena, and Scroggins' ability to seek such information, to the extent relevant, from a more logical target to the litigation, the Court quashes the Subpoena. *Jordan*, 921 F.3d at 190 n.4 (recognizing that a "subpoena may be so sweepingly overbroad . . . that it should be quashed in its entirety" and that "where the recipient has already provided a substantial response, 'quashing' the subpoena effectively narrows it by limiting it to what has already been produced"); *People for the Ethical Treatment of Animals, Inc. v. Vital Farms, Inc.*, No. 2:22-mc-24-EWH-RJK, 2023 WL 5506028, at *4 (E.D. Va. Aug. 14, 2023) (affirming decision to quash a subpoena where the subpoena was substantially overbroad and sought privileged and irrelevant information).

### E. The Court denies Trans Union's Rule 37 request for sanctions.

Trans Union requests an award of reasonable attorneys' fees and expenses incurred in bringing the Motion pursuant to Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure. (ECF No. 2, at 6-7.) Rule 37(a) provides a mechanism for a party to a litigation to "move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). Where a motion to compel is granted, or where disclosure is made or discovery is provided after the filing of a motion to compel, Rule 37(a)(5)(A) mandates an award of reasonable attorneys' fees and expenses in bringing the motion absent certain circumstances. Fed. R. Civ. P. 37(a)(5)(A). Rule 37(a)(5)(A) does not apply

to this Motion, which seeks to quash a non-party subpoena. Therefore, the Court will deny Trans Union's request for sanctions under Rule 37(a)(5)(A).

### IV. CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART Trans Union's Motion to Quash Subpoena to the extent it seeks to quash the Subpoena and will DENY IN PART Trans Union's Motion to the extent it seeks an award of attorneys' fees and expenses under Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure. An appropriate Order will accompany this Memorandum Opinion.

/s/
Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: September 9, 2024